```
               IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
                        HOUSTON DIVISION

BANCROFT LIFE & CASUALTY          §
ICC, LTD.,                        §
                                  §
      Plaintiff,                  §
                                  §
v.                                §   CIVIL ACTION NO. H-11-2382
                                  §
FFD RESOURCES III, LLC,           §
                                  §
      Defendant,                  §
                                  §
                                  §
FFD RESOURCES III, LLC and        §
FFD VENTURES, LP,                 §
                                  §
      Counter-Plaintiffs,         §
                                  §
v.                                §
                                  §
BANCROFT LIFE & CASUALTY          §
ICC, LTD.,                        §
                                  §
      Counter-Defendant.          §
```

MEMORANDUM AND ORDER

Pending is Counterclaim-Defendant Bancroft Life & Casualty ICC, Ltd.'s Motion to Dismiss the Counterclaims (Document No. 39). After having reviewed the motion, response, reply, and applicable law, the Court concludes as follows.

I. Background

Plaintiff and Counter-Defendant Bancroft Life & Casualty ICC, Ltd. ("Bancroft") is an insurance company based in St. Lucia that

sells insurance for certain business losses.[1]  Counter-Plaintiffs FFD Ventures ("Ventures") and FFD Resources III, LLC ("FFD3," collectively, "Counter-Plaintiffs"), which are affiliated payday loan companies,[2] allegedly bought Bancroft's insurance product, "Premium Lite," to cover the risk of losses on payday loans. Richard Clay ("Clay"),[3] General Partner for Ventures, signed the Application for Insurance ("Application") on Ventures's behalf.[4] FFD3 and two other related companies are listed on the Certificate of Insurance ("Certificate") as "Additional Insureds."[5]

Bancroft allegedly gives to its insureds the opportunity to borrow back 70% of their premiums in the form of loans that are

---

[1] Document No. 21 at 10 ¶ 2.

[2] *See* Document No. 1. at 2.

[3] Document No. 21 at 16 ¶ 21.

[4] *See* id. at 16-19 & ex. N.

[5] *See* Document No. 39, ex. 1 and Document No. 21, ex. A (Certificates of Insurance naming FFD Ventures as the "Certificate Holder" and FFD Resources I, FFD Resources II, FFD Resources III, and FFD Resources IV as "Additional Insureds").  FFD3 and Ventures are indirectly affiliated through a web of companies. Bancroft has filed at least four lawsuits against the FFD-related companies listed as Additional Insureds and Richard Clay: (1) Bancroft Life & Casualty ICC, Ltd. v. FFD Resources III, LLC, No. 4:11-cv-2382 (the present lawsuit before this Court); (2) Bancroft Life & Casualty ICC, Ltd. v. FFD Resources II, LLC, No. 4:11-cv-2384 (pending in Judge Harmon's court); (3) Bancroft Life & Casualty ICC, Ltd. v. FFD Resources IV, LLC, No. 3:11-cv-214-LRH-WGC (pending in the district of Nevada); and (4) Bancroft Life & Casualty ICC, Ltd. v. Richard Clay, No. 1:11-cv-01505-SCJ (pending in the Northern District of Georgia).

represented by promissory notes and are secured by collateral.[6] After approximately three years of successful business dealings with each other,[7] Bancroft alleges that FFD3 failed to pay on certain notes and filed this suit to collect $248,234.00, plus interest and collection costs, and to foreclose on the collateral.[8]

FFD3, joined by its affiliate Ventures, counterclaimed against Bancroft, alleging: breach of contract for failure to pay the insurance claim and failure to return unused premium; conversion; fraudulent inducement; breach of fiduciary duty; unjust enrichment; an accounting; rescission; declaratory judgment that the promissory notes are not due and owing; and a declaration of their rights under the insurance policy.[9]

The issue presented here is whether this Court should grant Bancroft's motion to dismiss the counterclaims based upon a proviso in the insurance policy that St. Lucia is the exclusive venue for actions "arising from or in any way related to the Policy or any

---

[6] Document No. 21 at 17-19 ¶¶ 24, 31.

[7] Bancroft claims that although FFD3 paid the amounts due for the years 2007, 2008, and 2009, it failed to pay the December 2010 loan payment.  Document No. 1 at 7.

[8] Document No. 1 at 1 (Orig. Complt.); *see also* id., exs. A-1, A-2, A-3, A-4, B-1, B-2, B-3, and B-4 (Notes and Security Agreements).

[9] *See* Document No. 21.

3

Claim."[10] Bancroft alternatively moves to dismiss the counterclaims for failure to state a claim for which relief can be granted.

## II. Motion to Dismiss for Improper Venue

### A. Legal Standard

Rule 12(b)(3), which establishes a defense of improper venue, may be used to seek dismissal based on a forum selection clause. *See* FED. R. CIV. P. 12(b)(3); Lim v. Offshore Specialty Fabricators, Inc., 404 F.3d 898, 902 (5th Cir. 2005).[11] Federal law governs the determination of the enforceability of a forum selection clause for diversity cases in federal court. Haynsworth v. The Corporation, 121 F.3d 956, 962 (5th Cir. 1997). Forum-selection clauses are "prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances." M/S Bremen v. Zapata Off-Shore Co., 92 S. Ct. 1907, 1913 (1972) (internal quotation marks and citations omitted). "Unreasonableness potentially exists where (1) the incorporation of

---

[10] Document No. 39, ex. 4 at 16 ¶ XXVIII D (Jan. 1, 2010 Group Policy St. Lucia forum selection clause provision).

[11] *See also* Noble Drilling Servs., Inc. v. Certex USA, Inc., 620 F.3d 469, 472 n.3 (5th Cir. 2010) (noting that the Fifth Circuit "has not previously definitively decided whether Rule 12(b)(1) or Rule 12(b)(3) is the proper rule for motions to dismiss based on an arbitration or forum-selection clause" but declining to address the issue because, as here, the parties did not address it) (citing Ambraco, Inc. v. Bossclip B.V., 570 F.3d 233, 238 n.1 (5th Cir. 2009)).

4

the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state." Haynsworth, 121 F.3d at 963.  "The party resisting enforcement [of the forum selection clause] on these grounds bears a 'heavy burden of proof.'" Id. (quoting The Bremen, 92 S. Ct. at 1917); *accord* Afram Carriers, Inc. v. Moeykens, 145 F.3d 298, 301 (5th Cir. 1998) ("The burden of proving unreasonableness is a heavy one, carried only by a showing that *the clause* results from fraud or overreaching, that it violates a strong public policy, or that enforcement of the clause deprives the [resisting party] of his day in court." (citations omitted) (emphasis in original)).

B.   Discussion

Counter-Plaintiffs object to the Court's enforcement of the Saint Lucia forum selection clause for three reasons: (1) they never agreed to the clause; (2) Bancroft waived the clause when it brought the suit on the Notes in a court other than one in Saint Lucia; and (3) the Saint Lucia clause is unreasonable.[12]

---

[12] Document No. 49 at 5.

1. <u>Agreement to the Clause</u>

"The Court first must determine whether Defendant agreed to the clause before considering whether it is *enforceable*." <u>Valero Mktg & Supply Co. v. Baldwin Contracting Co., Inc.</u>, No. H-09-2957, 2010 WL 1068105, at *2 (S.D. Tex. Mar. 19, 2010). The parties dispute whether the amended Saint Lucia forum selection clause found in the 2010 Group Policy was effectively incorporated into their agreement. It is undisputed that Clay, on behalf of Ventures, signed the Application for Insurance agreeing to a forum selection clause that named the British Virgin Islands and warranting that Ventures understood that this insurance could not be obtained in the United States. The Application was an offer by Ventures to buy insurance from Bancroft, who accepted by issuing a Certificate of Insurance.[13] The Certificate, issued annually for each new coverage year, confirmed coverage under a Group Policy which could be viewed pursuant to instructions on the Certificate.[14] The 2010 Certificate, bearing at the top of the front page

---

[13] *See* Document No. 21, ex. N § 2(i) (Application is not an offer by Bancroft); <u>id.</u>, ex. N § G(c) ("Coverage applied for becomes effective only upon acceptance and approval of this Application by the Association and the Insurer. Upon such acceptance the Certificate of Insurance will bear the Effective Date as set forth on page one.").

[14] The Application, in its "Commonly Asked Questions" Section which Clay initialed, provided: "Each year, a new Certificate of Insurance will be provided with updated terms." <u>Id.</u>, ex. N at Page 48 of 59 Question (10).

Bancroft's name and address in "Castries, Saint Lucia, West Indies," expressly states in regular font on its front page, that "the Group Policy sets forth the terms and conditions of the insurance provided."[15] By virtue of the Certificate, therefore, Counter-Plaintiffs received constructive notice of the terms of the Group Policy that governed their agreement with Bancroft. *See* Steel Warehouse Co., Inc. v. Abalone Shipping Ltd. of Nicosai, 141 F.3d 234, 237 (5th Cir. 1998) (holding that "proper incorporation yields constructive notice" where the parties were sophisticated and the document clearly referenced the charter party containing the arbitration clause); *see also* TIG Ins. Co. v. Sedgwick James of Washington, 184 F. Supp. 2d 591, 598 (S.D. Tex. 2001) (Atlas, J.) (where the certificate of insurance referenced the policy, "the holder of a certificate of insurance should obtain the insurance policy to ascertain his coverage," rejecting plaintiffs' argument

---

[15] Document No. 39, ex. 1. The 2010 Group Policy, containing the above-stated Saint Lucia forum selection clause, was the policy in effect when Counter-Plaintiffs filed their business loss claims in October 2010. By 2010, Bancroft had amended its Group Policy to remove the British Virgin Islands forum selection clause and to substitute the Saint Lucia clause. Thus, the British Virgin Islands clause no longer applied. *See, e.g.*, McAvey v. Lee, 260 F.3d 359, 364 (5th Cir. 2001) (holding that the insurance company's failure "to continue or re-adopt" an exclusion in the applicable policy effectively deleted that provision and rendered it inoperative); 29 WILLISTON ON CONTRACTS § 73:17 (4th ed. 2003) ("A contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract."). The subject of the Court's analysis, therefore, is whether the 2010 Saint Lucia forum selection clause is enforceable.

7

that they never received the policy and therefore could rely solely on the certificate of insurance).

There is no indication that Counter-Plaintiffs ever objected to being bound by the Group Policy referenced and which was then effective with the issuance of each year's new Certificate. "Any act inconsistent with an intent to avoid a contract has the effect of ratifying the contract." Missouri Pac. R. Co. v. Lely Dev. Corp., 86 S.W.3d 787, 791 (Tex. App.--Austin 2002, pet. dism'd). In fact, Counter-Plaintiffs admit that they relied on the policy to make five previous claims over their course of dealings with Bancroft, all of which "Bancroft paid *according to the terms of the policy*."[16] See Lely, 86 S.W.3d at 791 ("Ratification may be inferred by a party's course of conduct and need not be shown by express word or deed.").

Notwithstanding Counter-Plaintiffs' contention that they never signed a document agreeing to the amended terms in the Group Policy, Counter-Plaintiffs filed their present claim for benefits under the 2010 Group Policy now at issue. Seeking benefits under the 2010 Group Policy estops Counter-Plaintiffs from claiming that they are not bound by its venue clause. See Hellenic Investment Fund, Inc. v. Det Norske Veritas, 464 F.3d 514, 517-18 (5th Cir. 2006) ("Direct-benefit estoppel 'involve[s] non-signatories who, during the life of the contract, have embraced the contract despite

---

[16] Document No. 21 ¶ 85 (emphasis added).

their non-signatory status but then during litigation, attempt to repudiate the arbitration clause in the contract.'" (quoting E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 200 (3d Cir. 2001))); In re Kellogg Brown & Root, Inc., 166 S.W.3d 732, 739 (Tex. 2005) ("Under 'direct benefits estoppel,' a non-signatory plaintiff seeking the benefits of a contract is estopped from simultaneously attempting to avoid the contract's burdens, such as the obligation to arbitrate disputes.").

Further, although Counter-Plaintiffs maintain that they never saw the policy, they do not contend that Bancroft prevented them from seeing it, nor do they claim that they ever sought to read it. Failure to read a policy does not excuse a party from its conditions and other provisions. *See, e.g.*, Shindler v. Mid-Continent Life Ins. Co., 768 S.W.2d 331, 334 (Tex. App.--Houston [14th Dist.] 1989, no writ) ("An insured will be deemed to know the contents of the contract he makes." (citing Standard Accident Ins. Co. v. Employers Cas. Co., 419 S.W.2d 429, 432 (Tex. Civ. App.--Dallas 1967, writ ref'd n.r.e.))); *see also* Proctor v. Southland Life Ins. Co., 522 S.W.2d 261, 265 (Tex. Civ. App.--Fort Worth 1975, writ ref'd n.r.e.) (rejecting plaintiff's contention that, because he left the policy with his agent, his ignorance of its terms was excused); In re Int'l Profit Assocs., Inc., 286 S.W.3d 921, 924 (Tex. 2009) ("Simply being unaware of a forum-selection

9

clause does not make it invalid."). Counter-Plaintiffs were issued a Certificate confirming coverage under terms and conditions set forth in a Group Policy, were instructed how to access the Policy, and admittedly filed claims "under the terms of the policy"; they are therefore estopped from claiming that they did not agree to the forum selection clause contained therein.

2.  No Waiver

Counter-Plaintiffs also contend that Bancroft waived the Saint Lucia forum selection clause by filing the instant action to collect on the Notes in a forum other than Saint Lucia. "Waiver is generally understood to be the intentional relinquishment of a known existing legal right." N. Am. Specialty Ins. Co. v. Debis Fin. Servs., Inc., 513 F.3d 466, 470 (5th Cir. 2007) (quotation omitted). "For waiver to occur, there must be an existing right, knowledge of its existence, and either an actual intention to relinquish that right or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." Id. The 2010 Group Policy's Saint Lucia forum selection clause contains a specific exception, namely, that "[t]his forum selection provision shall not apply to an action brought by the Company to enforce the terms of any loan made by the Company to a Certificate Holder."[17]  The Notes and Security

---

[17] Document No. 39, ex. 4 at 16 ¶ XXVIII D.

Agreements expressly provide that they are governed by Texas law.[18] Given the carved-out exception in the Saint Lucia forum selection clause for suits brought by Bancroft on loans, and the parties' agreements that Texas law applies to the notes and security agreements, Bancroft's filing in the United States of this suit on the loans does not constitute a waiver by Bancroft of the Saint Lucia forum selection clause for suits arising from or related to the Policy or claims made under the Policy.

Nor is there merit to Counter-Plaintiffs' argument that their claims to enforce the benefits of the insurance policy are compulsory counterclaims and therefore must be brought in this Court. Assuming without deciding that Counter-Plaintiffs' Policy claims fall within the ambit of Rule 13(a) because they "arise[] out of the transaction or occurrence that is the subject matter of the opposing party's claim," FED. R. CIV. P. 13(a)(1)(A), the Court may not ignore the forum-selection clause. *See e.g.,* Publicis Commc'n v. True North Comm'cns Inc., 132 F.3d 363, 365 (7th Cir. 1997) (Easterbrook, J.) (holding that counterclaims subject to a forum selection clause must be brought in the specified forum and are not susceptible to preclusion for not being brought as compulsory counterclaims). In other words, the forum selection clause precludes Bancroft from later claiming that the Counter-

---

[18] Document No. 1, exs. A-1 ¶ 11, A-2 ¶ 11, A-3 ¶ 11, A-4 ¶ 11, B-1 ¶ 6.01, B-2 ¶ 6.01, B-3 ¶ 6.01, and B-4 ¶ 6.01.

Plaintiffs may not assert their insurance claims in Saint Lucia. *See* id. at 366 ("If the parties promise to litigate a dispute only in a particular forum, a party to the contract cannot seek to bar the litigation in that forum because the claim was not presented in some other forum."). Counter-Plaintiffs have made no showing that courts in Saint Lucia, which is an independent member state of the British Commonwealth and recognizes Queen Elizabeth II as head of state, and which has a judicial system that applies English common law, with final appeal to the Privy Council in London, would not respect the foregoing principle.

    3.    <u>Forum Selection Clause Is Not Unreasonable</u>

Counter-Plaintiffs argue that the forum selection clause is unreasonable because: (1) it is the product of fraud or overreaching; (2) a jury trial is not available in Saint Lucia and thus Counter-Plaintiffs will be deprived of their day in court; and (3) enforcing the forum selection clause would be against Texas public policy.

First, Counter-Plaintiffs' fraud argument centers on Bancroft at some point between 2005 and 2008, amending the Group Policy to designate Saint Lucia as the exclusive forum for litigation in place of the British Virgin Islands, allegedly without notice to Cross-Plaintiffs. As already observed, Counter-Plaintiffs from the beginning of their relationship with Bancroft well knew that they

were dealing with a Caribbean entity--shown on the 2005 insurance application with an address in British Virgin Islands, and on Certificates of Insurance beginning in 2006 and each year afterwards with an address in Saint Lucia, West Indies--to purchase an insurance product that was not available in the United States and that Bancroft could not sell or offer to sell in the United States.  The insureds knew that if Bancroft accepted Counter-Plaintiffs' application for its offshore insurance product, that Counter-Plaintiffs would be required to seek redress for insurance claim disputes in a foreign jurisdiction, initially the British Virgin Islands.  Counter-Plaintiffs also knew that in order to read the entirety of the Group Policy referenced in each annual Certificate of Insurance, they would need to do so in the British Virgin Islands through the 2009 Policy year, and then, pursuant to the 2010 Certificate of Insurance, they would find that year's Group Policy available for review in Saint Lucia.  Thus, when Counter-Plaintiffs received their Certificate of Insurance dated December 31, 2009, for the year 2010, they had notice that Bancroft was then located in Castries, Saint Lucia, West Indies (its address since 2006), that the Group Policy "sets forth the terms and conditions of the insurance provided," and that the Group Policy may be reviewed by written request and appointment in Saint Lucia.  The amendment to the Group Policy, to require that litigation related to the Policy be brought in Saint Lucia rather than the

British Virgin Islands, was available for Counter-Plaintiffs' inspection along with the rest of the Group Policy if they had chosen to view the same.  These are sophisticated parties--a foreign insurance company steering clear of American law and selling products not obtainable in the United States, and large pay-day loan entities acquiring millions of dollars of business insurance, available only abroad, in order to achieve certain business and federal income tax objectives in the United States.  Richard Clay, President of the General Partner of the payday loan applicants, agreed and expressly warranted in the insurance application that the applicant is "a sophisticated person with a substantial net worth in excess of USD $1,000,000," and that applicant "has the same level of sophistication as an accredited investor would have for securities purposes."  The facts presented here are not properly characterized as fraud such as to render the forum selection clause unenforceable.  *See, e.g.*, The Bremen, 92 S. Ct. at 1914 (finding that the forum selection clause was "made in an arm's-length negotiation by experienced and sophisticated businessmen" and that "it should be honored by the parties and enforced by the courts").

Counter-Plaintiffs also claim that they were fraudulently induced to form the contract as a whole, but the Supreme Court has held that *the forum selection clause itself* must be the product of fraud or overreaching in order for it to be unenforceable.  Scherk

14

v. Alberto-Culver Co., 94 S. Ct. 2449, 2457 n.14 (1974) ("This [fraud] qualification does not mean that any time a dispute arising out of a transaction is based on an allegation of fraud, as in this case, the clause is unenforceable. Rather, it means that [a] . . . forum selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion." (emphasis in original)); *see also* Afram, 145 F.3d at 301-02 ("Were we to judge the soundness of the forum-selection clause by what we believe to be the merits of the underlying contract, we would subvert the aforementioned comity concerns by making a merits inquiry that the Supreme Court has determined is best left to the forum selected by the parties.").

Counter-Plaintiffs' second argument is that litigating in Saint Lucia would "effectively deprive them of their day in court." This is not persuasive. "The Supreme Court has . . . instructed American courts to enforce [forum-selection] clauses in the interests of international comity and out of deference to the integrity and proficiency of foreign courts." Mitsui & Co. (USA), Inc. v. Mira M/V, 111 F.3d 33, 35 (5th Cir. 1997) (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 105 S. Ct. 3346, 3355 (1985)). Moreover, the necessity of traveling to a remote forum does not preclude the enforcement of a forum selection clause. *See* Pugh v. Arrow Electronics, Inc., 304 F. Supp. 2d 890,

15

895 (N.D. Tex. 2003) (Solis, J.) (citing Carron v. Holland, 51 F. Supp. 2d 322, 326 (E.D.N.Y. 1999)).

Similarly unavailing is Counter-Plaintiffs' argument that the lack of a provision for a jury trial makes enforcement of the forum selection clause unjust in this case. *See, e.g.*, Interam. Trade Corp. v. Companhia Fabricadora de Pecas, 973 F.2d 487 (6th Cir. 1992) (enforcing a Brazil forum selection clause because plaintiff would not be deprived of his day in court even though he would have no right to a jury trial in Brazil); Alt. Delivery Solutions, Inc. v. R.R. Donnelley & Sons Co., No. Civ. SA05CA0172-XR, 2005 WL 1862631, at *12-13 (W.D. Tex. July 8, 2005) (Rodriguez, J.) (holding a forum selection clause enforceable even though a Mexico forum would not allow the case to be tried by a jury). In Alternative Delivery Solutions, the court explained:

> To invalidate all forum selection clauses that designate forums that do not provide for a jury trial would implicate many of the comity concerns raised by the Supreme Court in The Bremen and other cases concerning international agreements. Further, Plaintiff's argument that being deprived of its right to jury trial will "for all practical purposes . . . prevent [plaintiff] from having its day in court" is wholly unconvincing, for such a conclusion would presumptively invalidate all bench trials and arbitration clauses.

2005 WL 1862631, at *12. Other Circuits have also held that a lack of jury trials does not render a forum inadequate. *See, e.g.*, Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 23-24 (1st

16

Cir. 2009); Interamerican Trade Corp., 973 F.2d at 489 (6th Cir. 1992); Lockman Found. v. Evangelical Alliance Mission, 930 F.2d 764, 768 (9th Cir. 1991); In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec., 1984, 809 F.2d 195, 199 (2d Cir. 1987) *cert. denied*, 108 S. Ct. 199 (1987).  Moreover, the Fifth Circuit has observed that the Supreme Court has "roundly rejected the notion that a forum selection clause can be circumvented by a party's asserting the unavailability of American remedies." Haynsworth, 121 F.3d at 967 (citing Scherk, 94 S. Ct. at 2456-57).

Finally, Counter-Plaintiffs' argument that enforcing the forum selection clause would be contrary to Texas public policy, as expressed in the Texas Insurance Code, lacks merit.  Counter-Plaintiffs expressly agreed to litigate insurance matters in a non-Texas forum and that the insurance they were buying could not be obtained in the United States; hence Counter-Plaintiffs' refuge in the Texas Insurance Code is ineffectual.  The Fifth Circuit in Haynsworth stated:

> It defies reason to suggest that a plaintiff may circumvent forum selection and arbitration clauses merely by stating claims under laws not recognized by the forum selected in the agreement.  A plaintiff simply would have to allege violations of *his country's* tort law or *his country's* statutory law or *his country's* property law in order to render nugatory any forum selection clause that implicitly or explicitly required the application of the law of another jurisdiction.

17

121 F.3d at 969 (quoting Roby v. Corporation of Lloyd's, 996 F.2d 1353 (2d Cir. 1993) (emphasis in original)).  In sum, Counter-Plaintiffs have not "advanced a sound rationale to overcome the presumption that federal courts 'must enforce forum selection clauses in international transactions.'"  Hellenic Inv. Fund, 464 F.3d at 520 (quoting Haynsworth, 121 F.3d at 962).  Therefore, Counter-Plaintiffs have failed to meet their heavy burden of persuasion to show that the Saint Lucia forum selection clause is unreasonable under the circumstances shown here.

For the foregoing reasons, the first eight counterclaims, and part of the ninth counterclaim, must be dismissed for improper venue because they arise from or relate to the insurance contract or claims made thereunder, to wit:  coverage for claims submitted (Count I), return of insurance premium (Count II); conversion of the insurance reserves (Count III); fraudulent inducement to purchase the "Premium Lite" insurance product (Count IV); breach of fiduciary duty for investing insurance premium money entrusted to Bancroft (Count V); unjust enrichment of insurance premiums (Count VI); demand for an accounting, which is dependent on the breach of fiduciary duty claim (Count VII); rescission of the insurance agreement (Count VIII); and that portion of Count IX, seeking declaratory judgment that Bancroft has "sufficient reserves in its premium account to offset the amounts purportedly due."  The

remaining portion of Count IX, seeking declaratory judgment that the notes are not due and owing, and that FFD III owes no money on the notes, will also be dismissed without prejudice because the counterclaim adds nothing to the lawsuit and merely states Cross-Plaintiffs' denial of liability in answer to Bancroft's suit on the notes.

Finally, Bancroft's motion to dismiss Ventures's claims is GRANTED, inasmuch as only interest is in the insurance contract.[19]

### III. Order

Accordingly, for the foregoing reasons, it is

ORDERED that Counterclaim-Defendant Bancroft Life & Casualty ICC, Ltd.'s Motion to Dismiss the Counterclaims (Document No. 39) is GRANTED, Counts I-VIII and that portion of Count IX seeking a declaration of rights under the insurance policy, are all DISMISSED without prejudice for improper venue; that portion of Count IX seeking declaratory judgment that Counter-Plaintiffs have no liability on the notes is DISMISSED without prejudice as redundant of FFD III's Answer to Bancroft's suit denying liability on the

---

[19] In view of the analysis made in this Memorandum, the Court recognizes that it erred in its Order signed November 1, 2011, which allowed FFD Ventures, LP to join in the counterclaim against Bancroft.

notes; and all counterclaims of FFD Ventures, LP are DISMISSED without prejudice for improper venue.

The Clerk shall notify all parties and provide them with a signed copy of this Order.

SIGNED at Houston, Texas, on this 21st day of June, 2012.

_____
EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE